IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HOLLY JOHNSTON,

Plaintiff,

3:10-CV-540-PK

v.

FINDINGS AND RECOMMENDATION

KIMBERLY-CLARK GLOBAL SALES LLC,

Defendant.

PAPAK, Magistrate Judge:

Plaintiff Holly Johnston filed this action against defendant Kimberly-Clark Global Sales LLC ("KCGS") in the Multnomah County Circuit Court on April 1, 2010, alleging KCGS' liability for intentional interference with economic relations. KCGS removed the action to this court on May 11, 2010. This court has jurisdiction over Johnston's action pursuant to 28 U.S.C. § 1332(a), based on the complete diversity of the parties and the amount in controversy.

Now before the court is KCGS' motion (#42) for summary judgment. I have considered the motion, oral argument on behalf of the parties, and all of the pleadings on file. For the reasons set forth below, KCGS' motion should be granted, and Johnston's claim dismissed with prejudice.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## FACTUAL BACKGROUND[1]

In or around October 2006, Johnston was hired as an associate attorney by Banner &

[1] The following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56. That is, in construing the record I view the evidence and all factual inferences drawn from the underlying facts in the light most favorable to the non-moving party, for purposes of the motion now before the court only. *See, e.g., T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Asso.*, 809 F.2d 626, 630-631 (9th Cir. 1987) ("[A]t summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party: if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. . . . Inferences must also be drawn in the light most favorable to the nonmoving party. Inferences may be drawn from underlying facts that are not in dispute, such as background or contextual facts, . . . and from underlying facts on which there is conflicting direct evidence but which the judge must assume may be resolved at trial in favor of the nonmoving party.") (citations omitted).

Witcoff, Ltd. ("B&W"), a Portland-based law firm specializing in intellectual property litigation. From the date she was hired through the first months of 2010, Johnston received consistently favorable employee reviews from B&W.

On or around June 12, 2009, Johnston filed a personal injury action against the I-Flow Corporation in the United States District Court for the Northern District of Illinois (the "I-Flow action"), alleging that she had been injured by an I-Flow "pain pump" that had been implanted in her left knee. Approximately five months later, in November 2009, KCGS acquired the I-Flow Corporation. KCGS was at that time, and still is, one of B&W's largest clients, accounting for a substantial proportion of the firm's revenue.

In December 2009, KCGS' Vice President and Chief Counsel of Litigation Kyle Kappes learned that Johnston was prosecuting a lawsuit against KCGS' new subsidiary, I-Flow. Kappes believed that Johnston's maintenance of the I-Flow action gave rise to a "potential conflict of interest." Deposition of Kyle Kappes dated November 9, 2010 ("Kappes Dep. I"), 10:17-18. On December 21, 2009, Kappes called Marc Cooperman, a partner at B&W and Kappes' primary contact at the firm, to discuss the I-Flow action. Kappes inquired of Cooperman whether he was aware that a B&W attorney was maintaining a legal action against a KCGS subsidiary, and Cooperman responded in the negative, but "indicated that he would look into it." Kappes Dep. I, 11:5-19. Kappes characterized the I-Flow action to Cooperman as "effectively . . . a lawsuit against [KCGS]." Deposition of Marc Scott Cooperman dated November 5, 2010 ("Cooperman Dep."), 14:17. Either in that initial conversation regarding the I-Flow action or in another early conversation on the matter, Kappes advised Cooperman of his belief that the action created a potential conflict of interest. Kappes told Cooperman something to the effect that "We can't have

one of our outside attorneys suing [KCGS]," although he did not use those precise words. Cooperman Dep., 24:21 - 25:5. Cooperman shared this remark with Janice Mitrius, B&W's president and a member of the B&W board of directors, shortly thereafter.

Mitrius and Chuck Miller, another member of B&W's board, met with Johnston on the afternoon of December 21, 2009, to inform her of Kappes' reaction to learning about her action against I-Flow. Mitrius advised Johnston that B&W would put in place an ethical wall to seal her off from matters involving KCGS, and further advised Johnston that the B&W board would meet to discuss what further actions might be taken. In response, Johnston asked whether KCGS was demanding her job, to which Mitrius replied, "Not yet." Deposition of Holly Johnston dated December 16, 2010 ("Johnston Dep."), 23:17-19.

Within approximately one week thereafter, the ethical wall was put in place, and Johnston was screened from working on KCGS matters and from accessing KCGS materials and information. There is no indication that the ethical wall was ever breached or was in any way inadequate. On two or three prior occasions similar ethical walls had been set up at B&W, without any subsequent problems.

Cooperman advised Kappes that the ethical wall had been put in place. Kappes, however, "wasn't sure if [the ethical wall put in place by B&W] completely resolved the ethical issue or not." Kappes Dep. I, 13:7-8. In addition, Kappes remained concerned by the risk that, in any litigation in which B&W represented KCGS, if it came to light that a B&W attorney was suing a KCGS subsidiary, it might in some manner "undermine the credibility of [KCGS] in the eyes of any particular fact-finder." Kappes Dep. I, 13:13-19. Kappes does not recall whether he specifically expressed these concerns to Cooperman or Mitrius.

Johnston offers the expert opinion of Garry Kahn that evidence of the I-Flow action would properly be excluded in any unrelated intellectual property litigation in which KCGS was represented by B&W, and that such exclusion could be procured by means of a motion *in limine*.

In late December 2009 or early January 2010, Kappes contacted Cooperman to inquire whether he would be willing to ask Johnston whether she would object to meeting with Kappes to discuss informal resolution of the I-Flow action. On or around January 4, 2010, Cooperman and Mitrius met with Johnston to relay Kappes' request to her. Cooperman advised Johnston that Kappes wanted "to meet with [her] without [her] attorney," assuring her that, although Kappes was KCGS' counsel, he was also an officer of KCGS, so that the meeting would not be between counsel and an opposing represented party, but rather between party representatives. Johnston Dep., 27:19-20. Neither Cooperman nor Mitrius suggested that Johnston's continued employment was contingent on her attendance at the meeting.

Within the next two days, Johnston contacted Kappes to set up the requested meeting. The meeting ultimately took place in late January or early February. Johnston attended the meeting accompanied by her husband and her attorney, and Kappes attended the meeting accompanied by an attorney for I-Flow. After hearing Johnston's recital of the facts underlying her dispute with I-Flow, Kappes advised Johnston that he believed her case was weak, and that her claims might be time-barred under the applicable statute of limitations. Kappes nevertheless indicated that KCGS might be willing to "help" with "some" future medical expenses. Johnston Dep., 46:16-18. Kappes further indicated that "[KCGS] cannot have one of its outside counsels suing it," Johnston Dep., 46:7-9, and that without Johnston's consent to settle the I-Flow action, "he would have to have a discussion with the folks at [B&W]," Johnston Dep., 46:10-13.

Following the meeting, on February 5, 2010, Johnston's attorney sent Kappes a letter in which he extended a settlement offer in an undisclosed amount. On February 11, 2010, Kappes responded with a letter in which he indicated that the settlement demand was "unreasonable and exceedingly disappointing," and that he had expected a significantly lower offer. Declaration of Richard Busse dated June 16, 2011 ("Busse Decl."), Exh. 23. Other evidence of record appears to indicate that Kappes valued Johnston's suit as somewhere in the range of $50,000 to $75,000, whereas Johnston believes that range understates the value of her claims by approximately an order of magnitude.

At that time or shortly thereafter, Kappes advised Cooperman and Mitrius that the settlement discussions had failed, and that he was "disappointed" by that outcome. Kappes Dep. I 18:8-15; *see also* Kappes Dep. I 19:10-12 (KCGS was "disappointed that one of [their] outside attorneys was suing [them]").

On February 24, 2010, B&W received a solicited ethics opinion letter from Vorys, Sater, Seymour and Pease, LLC ("Vorys"), regarding ethical issues raised by Johnston's prosecution of the I-Flow action. The letter indicated that Vorys had previously performed a preliminary analysis of the situation, and that Vorys had previously recommended that an ethical wall be put in place to close off Johnston's access to potentially confidential KCGS information, and had previously advised B&W that, under Oregon and Illinois ethical rules the I-Flow action gave rise to no ethical bar to B&W's continued representation of KCGS on matters unrelated to Johnston's claims against I-Flow. However, the letter further indicated that Vorys had since learned that a Boston, Massachusetts, office of the B&W firm was representing KCGS in the Massachusetts courts, and that the Massachusetts ethical rules materially differed from those of Oregon and

Illinois. Specifically, Vorys opined, under the Massachusetts rules, where an attorney would be barred from representing a client, all other attorneys employed by that attorney's law firm may also be disqualified from representing that client, whereas in Oregon and Illinois an attorney's disqualification does not extend to the attorney's firm.

Vorys further opined that the Massachusetts ethics rules permit a corporate parent and its subsidiary to be treated as a single entity for purposes of the disqualification analysis. Vorys expressly declined to opine that KCGS and I-Flow would be so considered for purposes of determining whether Johnston would be barred from representing KCGS, but nevertheless concluded that, "[i]n light of Massachusetts' apparent tendency to favor a rebuttable presumption that a parent corporation and its wholly-owned subsidiary should be treated as one unit for purposes of conflict of interest analyses, prudence may dictate that you treat [KCGS] and I-Flow Corporation as the same client. . . ." Declaration of Amanda Wendorff dated May 26, 2011 ("Wendorff Decl."), Exh. H at 3.

Johnston offers the expert ethics opinion of Peter Jarvis that the Vorys opinion letter was wrong on the merits as to whether any issues material to the I-Flow action could possibly give rise to an actual "personal interest conflict." Specifically, Jarvis notes that, under applicable Massachusetts rules, "theoretical" conflicts do not give rise to a personal interest conflict; to the contrary, only actual conflicts may rise to the level of ethics issues. On this basis, Jarvis opined that Vorys erred to suggest that an actual personal interest conflict could exist without showing that any specifically identifiable conflict actually existed. Indeed, Jarvis opined that the absence of any analysis of actual issue conflict between the I-Flow action and any issue raised in any Massachusetts litigation in which B&W represented KCGS suggested that the Vorys analysis

might not have been prepared in good faith: to make the determination Vorys purported to make, a factual analysis was necessary, and yet Vorys did not purport to undertake any analysis of the operative facts.

Moreover, Jarvis further opined that, under applicable Massachusetts choice of law rules, the Massachusetts courts would not apply Massachusetts ethics rules to determine whether B&W could be subject for discipline under the facts presented, but rather would apply applicable Oregon ethics rules. Jarvis opined that the absence of any choice of law analysis in the Vorys letter again suggests the possibility that they Vorys ethics analysis was not undertaken in good faith, and/or that Vorys was instructed to reach the conclusion it did.

On March 1, 2010, Mitrius called Johnston and advised her that B&W's seven-member board had voted to terminate her employment. Mitrius advised Johnston that the reason for her termination was her maintenance of the I-Flow action rather than any concerns regarding her performance. Mitrius advised Johnston that her termination was immediately effective.

Mitrius testified that the board had met and reached its decision regarding Johnston's employment that same day, March 1, 2010. She further testified that the board's decision had been unanimous.

KCGS offers the testimony of Cooperman that KCGS never expressly requested that B&W terminate Johnston, never expressly threatened to take business away from B&W if it did not terminate Johnston, did not play a role in reaching the decision to terminate Johnston, and never gave Cooperman the impression that KCGS was motivated to retaliate against Johnston. Mitrius similarly testified that KCGS did not threaten to take business away from B&W if it did not terminate Johnston. Chris Renk, a member of B&W's board, testified that the board did not

discuss whether KCGS had expressed concern over Johnston's prosecution of the I-Flow action, or whether there was a risk that B&W would lose some or all of KCGS' business if it did not terminate Johnston. Miller similarly testified that he did not believe KCGS pressured B&W to terminate Johnston.

## ANALYSIS

This court, sitting in diversity, must apply Oregon's conflict-of-laws rules to determine which jurisdiction's law governs the dispute before it. *See, e.g., Alaska Airlines, Inc. v. United Airlines, Inc.*, 902 F.2d 1400, 1402 (9th Cir. 1990), *citing Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under applicable Oregon law, the Oregon courts look to "the place where the injury occurred, the place where the conduct occurred, the domicile, nationality, place of incorporation and place of business of the parties, and the place where the relationship between the parties is centered" to determine the jurisdiction whose law should be applied. *See Western Energy, Inc. v. Georgia-Pacific Corp.*, 55 Or. App. 138, 145-146 (Or. Ct. App. 1981). Here, Johnston alleges that KCGS interfered with her employment in Oregon by directing communications calculated to procure the termination of her employment into Oregon, that she is an Oregon resident, and that KCGS is a Delaware entity doing business in Oregon, from which I conclude that the Oregon courts would apply Oregon law to the parties' dispute.[2] When applying Oregon law, this court is bound by the decisions of the Oregon Supreme Court, and where no such decision is available, must "predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *S.D. Myers, Inc. v. City & County of San Francisco*, 253 F.3d 461,

---

[2] Neither party argues for the application of any different jurisdiction's law.

473 (9th Cir. 2001), *quoting Strother v. S. Cal. Permanente Med. Group*, 79 F.3d 859, 865 (9th Cir. 1996).

Under Oregon law:

> To state a claim for intentional interference with economic relations, a plaintiff must allege: (1) the existence of a professional or business relationship; (2) intentional interference with that relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to the economic relations; and (6) damages.

*Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or. 487, 498 (1999), *citing McGanty v. Staudenraus*, 321 Or. 532, 535 (1995).

Moreover, "[d]eliberate interference alone does not give rise to tort liability." *Id.*; *see also Top Service Body Shop v. Allstate Ins. Co.*, 283 Or. 201, 209-10 (1973) ("[A] claim [of tort liability for intentional interference with a contractual or other economic relations] is made out when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means. They may be wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession.").

The *Northwest Natural Gas* court specified that:

> To be entitled to reach a jury, a plaintiff must not only prove that defendant intentionally interfered with h[er] business relationship but also that defendant had a duty of non-interference; *i.e.*, that [it] interfered for an improper purpose rather than for a legitimate one, or that defendant used improper means which resulted in injury to plaintiff. Therefore, a case is made out which entitles plaintiff to go to a jury only when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself.

*Northwest Natural Gas*, 328 Or. at 498 (citations, internal quotation marks omitted). The court

further explained that:

> **[I]f liability in tort is to be based on an actor's purpose, then the purpose must be to inflict injury on the plaintiff "as such."** And, if liability in tort is based on an actor's means, then the means must violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law, or, perhaps, an established standard of a trade or profession.

*Id.* (citations omitted; emphasis supplied).

Under Oregon law, therefore, a third-party's interference with another party's economic relations is not improperly motivated when its purpose is the pursuit of the third parties' own interests. *See, e.g.*, *Eusterman v. Northwest Permanente, P.C.*, 204 Or. App. 224, 238 (2006) ("not improper" for a corporate party's actions to be motivated to maximize its profits); *Top Service Body Shop, Inc. v. Allstate Ins. Co.*, 283 Ore. 201, 212 (1978) (not improper for a party to be motivated to pursue its own business purposes "as it saw them").

Here, there is no dispute that Johnston had an existing professional relationship with B&W prior to the termination of her employment by B&W on March 1, 2010, that KCGS was a third party to that relationship, or that Johnston suffered a harm cognizable as damages as a result of the termination of her employment. However, KCGS argues that, as a matter of law, Johnston has failed to offer evidence sufficient to permit a trier of fact to conclude that KCGS intentionally interfered with her employment relationship, that its interference, if any, was accomplished by improper means or for an improper purpose, or that its interference, if any, caused her termination and consequent damages.

As to the element of intentional interference, KCGS argues, correctly, that Johnston has offered no evidence that KCGS interfered with her employment relationship by making any direct and express attempt to pressure, cajole, intimidate, or threaten B&W into terminating her

employment. Nevertheless, it is undisputed that KCGS, through Kappes, its Vice President and Chief Counsel of Litigation, directly communicated to B&W its position that it was in some sense unacceptable to KCGS for an attorney employed by B&W to maintain a lawsuit against a KCGS subsidiary and, subsequently, its disappointment at Johnston's unwillingness to settle the I-Flow action at an amount significantly less than her prayer for damages. There can be no doubt that a pointed and direct expression of disappointment from a client responsible for a relatively high proportion of a service provider's revenue can be tantamount to an instruction that the service provider take steps to remove the source of the client's disappointment. Although Kappes' communications to B&W principals Cooperman and Mitrius cannot be read conclusively to establish KCGS' intentional interference with Johnston's employment relationship, the evidence is more than sufficient to create a question of fact on this element of Johnston's claim. KCGS is therefore not entitled to summary judgment on the proffered grounds that Johnston is unable as a matter of law to show that KCGS intentionally interfered with her employment relationship.

As to the element of causation, KCGS argues that Johnston cannot establish that its actions caused B&W to effect her termination in light of evidence that the B&W board reached its termination decision unanimously, after having received the Vorys opinion letter, or in light of the testimony of B&W board members that KCGS did not expressly attempt to influence their decision. This argument is unpersuasive. It is undisputed that B&W terminated Johnston solely due to her maintenance of the I-Flow action rather than for any reason related to her performance, and that it did so only after receiving KCGS' expressions of dissatisfaction with the situation. A trier of fact could reasonably infer that KCGS' expressions of dissatisfaction caused B&W to

effect Johnston's termination, to Johnston's resultant harm. KCGS is not entitled to summary judgment on the proffered grounds that Johnston is unable as a matter of law to establish that her damages were caused by KCGS' interference.

As to the element of improper means or improper purpose, I note preliminarily that Johnston does not argue that KCGS employed improper means to accomplish its interference, and that the evidentiary record is void of evidence of any such improper means. Johnston bases her claim, instead, on the theory that KCGS harbored an improper motive to cause her harm when it purportedly brought about her termination, either rather than or in addition to its proffered motive to eliminate a potential conflict of interest and/or to safeguard its credibility in unrelated litigation matters.[3] That is, Johnston takes the position that KCGS was motivated, at

---

[3] KCGS offers the argument that Johnston's claim cannot survive summary judgment unless Johnston is able to marshal facts from which a trier of fact could conclude that KCGS' sole and unmixed motive in interfering with Johnston's employment was to harm Johnston. In support, KCGS cites *Ron Tonkin Gran Turismo, Inc. v. Wakehouse Motors, Inc.*, 46 Or. App. 199 (1980), *Boers v. Payline Sys.*, 141 Or. App. 238 (1996), *Huston v. Trans-Mark Services, Inc.*, 45 Or. App. 801 (1980), and *Top Service Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201 (1978). However, while *Ron Tonkin*, *Boers*, and *Huston* do stand for the proposition that, under some circumstances, a claimant alleging intentional infliction of emotional distress on a theory of improper motive must establish that the party alleged to have interfered was motivated solely improperly, *Ron Tonkin* stands only for the proposition that where a third party interferes with a *competitor's* economic relations, such interference is not actionable if the third party is motivated in part to advance its own competitive interests, *see Ron Tonkin*, 46 Or. App. at 210-211, *Boers* and *Huston* stand only for the proposition that where an employee of a corporation interferes with the corporation's economic relationship with another party, the employee cannot be liable for intentional interference with the economic relationship if the employee was motivated in part to serve the employer corporation, *see Boers*, 141 Or. App. at 242-243, *Huston*, 45 Or. App. at 805-809, and the *Top Service* court merely approved a jury instruction which specified that interference conduct having the "unintended effect of deterring people from" entering into economic relations with a plaintiff is not actionable as intentional interference, *see Top Service* , 283 Or. at 207, n. 17. I find no Oregon cases holding that an improper purpose must be the sole motivating factor for a true third party's intentional interference with the economic relations of a non-competitor to be actionable under Oregon law.

least in part, to cause her injury "as such" when it advised B&W of its displeasure at Johnston's maintenance of the I-Flow action and of its disappointment at Johnston's refusal to settle the action at an amount acceptable to KCGS.

In support of her position that KCGS was motivated to cause her harm when it interfered with her employment relationship with B&W, Johnston calls into question the sincerity of Kappes' expressed concern regarding the potential that her maintenance of the I-Flow action could in any sense undermine KCGS' credibility in unrelated litigation matters, arguing that evidence of the I-Flow action would almost certainly be irrelevant to any such litigation matters, and that in any event a motion *in limine* would likely be sufficient to guarantee the exclusion of such evidence. While I agree with Johnston that Kappes' expressed concern appears disproportionate, I disagree with her suggestion that the exaggerated nature of the concern could create a question of fact as to KCGS' motive: even the clearest evidence that a concern is overblown does not constitute evidence that the concern is either insincere or nonexistent.

In further support of her position, Johnston calls into question the validity of the ethics opinion B&W obtained from Vorys in connection with its decision to terminate Johnston's employment, arguing that the Vorys opinion was incorrect on its merits and displayed indicia of bad faith, and noting that B&W apparently requested that Vorys reconsider its initially rendered opinion that Johnston's maintenance of the I-Flow action would create no ethical conflict. However, at issue here is not B&W's motive but rather that of KCGS, and assuming *arguendo* B&W's bad faith in connection with requesting and obtaining the Vorys opinion, B&W's bad faith does not create a question of fact as to whether *KCGS* harbored improper motivation for interfering with Johnston's employment.

Finally, Johnston asserts in further support of her position that KCGS used its position as one of B&W's largest clients to "pressure" Johnston into meeting with Kappes to discuss settlement of the I-Flow action, and to do so without legal representation.[4] However, the proposition that KCGS exerted such pressure, if established, would tend to undercut rather than to support Johnston's position: the clear suggestion is that KCGS would have considered its (real of perceived) problem solved had a settlement successfully been negotiated, and would not under those circumstances have required or desired that B&W effect Johnston's termination. This conclusion is bolstered rather than undermined by Kappes' expression of disappointment at the failure of the settlement discussions, in that KCGS' disappointment further suggests that a successful settlement would have satisfied its concerns. To the extent the evidence supports the inference that KCGS would have been satisfied by settlement of the I-Flow action, it likewise supports the inference that KCGS lacked personal animus toward Johnston and lacked motivation to cause her harm "as such." To the contrary, even with all inferences drawn in Johnston's favor, the evidence suggests that KCGS was motivated to bring about Johnston's termination, if at all, not because it wanted to see her suffer harm, but rather because it harbored an exaggerated concern that her dual status as KCGS complainant and KCGS counsel was in some sense a black mark on KCGS' credibility and created an untenable potential conflict of

---

[4] Although KCGS offers the testimony of Cooperman and Mitrius that Johnston was never asked to meet with KCGS without her lawyer being present, Johnston's testimony to the contrary creates a question of fact as to this issue. For purposes of determining whether this factual question is material to KCGS' motion, I therefore assume *arguendo* that Johnston was asked to attend the meeting without her legal representative. It is undisputed that Johnston attended the meeting accompanied by her attorney and by her husband (also apparently a lawyer), and that Kappes likewise attended the meeting accompanied by outside defense counsel from the I-Flow action.

interest.

While the evidence of record by no means establishes that KCGS lacked all improper motive to cause Johnston harm, the absence of any cognizable evidence affirmatively suggesting an improper motive leaves Johnston's theory speculative at best. "[S]peculation as to . . . improper motive does not rise to the level of evidence sufficient to survive summary judgment." *Karam v. City of Burbank*, 352 F.3d 1188, 1194 (9th Cir. 2003) (citation omitted). Because a trier of fact could not reasonably conclude from the evidence of record that KCGS harbored an improper motive for interfering with Johnston's employment relationship with B&W, her intentional interference claim necessarily fails, and KCGS is entitled to grant of summary judgment.

## CONCLUSION

For the reasons set forth above, I recommend that KCGS' motion (#42) for summary judgment be granted. Johnston's claim should be dismissed with prejudice, and a final judgment should be prepared.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a

///

///

///

copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 3rd day of August, 2011.

Paul Papak

Honorable Paul Papak
United States Magistrate Judge